Case number 17-10624, United States v. Schultz. Mr. Kessler, when you're ready. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Stephen Kessler. It is a privilege to appear before Your Honors representing the claimants in this matter, Gaspipe and all of the other claimants in the case. This case raises a very important issue, and that deals with the pretrial restraint of assets in a forfeiture proceeding. Once in a while we look at the cases that the U.S. Supreme Court takes up as an indication as to what the courts believe is important. In my world, which is one of forfeiture, I noticed that the last two years the Supreme Court has taken up two forfeiture cases. There is one in the pipeline now as well, which will be heard in the next term. So this is an important topic. Which one is that? I knew you were going to ask me. It starts with a T, and I will get it for you, Your Honor. Yes. But cert has already been accepted, and from what I read from the Supreme Court blog, it appears that that's going to be reversed as well in favor of the defendant. What's interesting is that virtually all of the forfeiture cases that have gone up to the Supreme Court have been decided in favor of the defense. And part of the reason for this case, why we're here, is because of what is the overreaching of the government in this particular situation. Just a little background on the forfeiture, if I may, Your Honors. Civil forfeiture was the way to go prior to 2000, and then Congress passed the Civil Asset Forfeiture Act of 2000, CAFRA. The vote was overwhelming. It was 410 to 25, something like that, in Congress. I don't see a lot of that happening. You do not, Your Honor. And not only that, and I believe Representative Hyde is deceased now, but Henry Hyde from Illinois and John Conyers from Michigan, two people who probably don't agree on what day it is today, they were the cosponsors of the bill. Passed overwhelmingly, was signed into law. The reason was because of all of the abuses under civil forfeiture from all over the country, and CAFRA was supposed to push the government to use criminal forfeiture in personam as opposed to the in rem proceeding, so that, at least in theory, there would be less abuse in the forfeiture realm. What's interesting about this case is that the restraints in this case, and Your Honors will notice this is a double-captioned case. There's a reason it's a double-captioned case. It's because the restraints in this case for virtually all of the property that I'm interested in anyway were done in the civil case. So there were civil restraints, and then there were a couple of planes that were involved in the criminal proceeding. But even the lower court acknowledged that we were keeping the double-caption, even though, in effect, the civil case is put on hold pending the criminal prosecution. So when we look at the standard that was applied below, the government talks about a low standard. Forfeiture is unique. Forfeiture isn't the regular civil complaint, the Iqbal Twombly test that we all know, the plausibility standard. And even under Iqbal Twombly, allegations, strict allegations, conclusory allegations are not sufficient. An indictment, to use the term of the former New York State Supreme Court Justice, we all know, those of us who've been prosecutors, that you can indict a ham sandwich. The standard is very low as far as that's concerned. But with forfeiture, it's different. And when you're dealing with pretrial restraint of assets, the Supreme Court in the last two years made a huge distinction, bright line between tainted and untainted assets. And there's a reason for that. We allow the pretrial restraint of tainted assets because of one of the legal fictions in forfeiture, which is the relation back doctrine. So at the time that the defendants alleged to have committed the crime, that's when the property is subject to forfeiture. But that's only when you're dealing with proceeds of the criminal activity. When you're dealing with untainted assets, the important thing is, as the Supreme Court said in Luis just last year – But aren't these buildings being used to sell this allegedly illegal stuff? So – Isn't that the whole point? So let me just describe my clients, if I may, Your Honor. This is not the Noriega Organization. These are successful business people. They're successful businesses. We've all seen them. And they are in business. And they remain in business. Are they not alleged to be selling illegal items in these very nice-looking businesses that are still in business? Which is only part of it. There's also the Rapids Camp Lodge, which is a hunting and fishing and hiking lodge in Alaska. No claim that anything improper happened there. There are the businesses, the real property as well. No claim anything happened there. That's strictly the money laundering connection as far as the government's concerned. And what's important in response to Your Honor's question is that, yes, there are allegations. I believe there were a handful of buys over a very short time period of controlled substance analogs. Controlled substance analog, as Your Honors know, is like a controlled substance. That's why it's analog. And prior to 2015, the government used controlled substance analogs just like it did with drug cases years back. It was the thing to charge. But McFadden came down in June of 2015. And McFadden said that you can, this Court is well aware of it, at least I know of two cases in the last couple of years that the Court has dealt with McFadden. McFadden said that when you're dealing with controlled substance analogs, you have to prove that the defendants knew that the controlled substance analogs that are charged in the indictment were in fact controlled substance analogs, or that they knew the features that made it out to be a controlled substance analog. So let's look at what the documents in this case, the accusatory documents, say about McFadden. That's going to be a very short look because the answer is nothing. What makes that remarkable, though, is that McFadden came down in 2015. There had been an indictment in this case. There was an arrest in 2014. There was an indictment. There was a superseding indictment before McFadden came down. And then after McFadden, we filed our papers, which are the result why we're here today, using McFadden as one of the reasons that the property has to be returned. So the government filed a second superseding indictment. And the language that is required under McFadden was found nowhere in the second superseding indictment. It wasn't anywhere in the amended civil complaint either. So then the government filed a third superseding indictment. And we're all waiting for the McFadden language to be put in the third superseding indictment. Nothing was added. So as we stand here, there, and I'm, we can talk about burdens of proof, but it doesn't matter which burden of proof you're looking at because there is no allegation in any of the accusatory instruments, civil or criminal in this case, that mirrors the language in McFadden. And that requires that any property that was restrained pursuant to the analog of violations to be dismissed. Now, the government's going to say, well, you know, we get to trial and we can put in the McFadden. Well, they do have some allegations about the substances they mixed with the spice, and they had a tutorial on how to do it. And I mean, can't you use the circumstances? Yes, but there is no allegation, Your Honor, regarding the men's rail. And here you have, I think of it, and I understand it's an adult-oriented, 12 stores, adult-oriented shops. We won't get into whether we attend them or not, but the point is this is kind of like a Walmart in the sense that we're only talking about what's sold on a couple of shelves. So this isn't an illegal business. In fact, the government has conceded such by allowing them to continue to operate. They sell many other things. And more importantly, as this court has required, there is no allegation regarding the percentage of funds that have been restrained that are directly traceable to the sale of the spice. So one thing that is not in the papers, Your Honor, is the men's rail requirement that is required by McFadden that is nowhere to be found. And according to Rule G, we are dealing with a civil restraint. Rule G of the Supplemental Rules of Admiralty and Maritime Claims and Asset Forfeiture Provisions, the government must prove, must state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial. Well, why isn't that met by the facts rather than using magic words like, and they knew? Because that's a conclusion anyway. There are no facts that allege the men's rail. What about all this spice stuff? That's what was sold. There's no allegation. Yeah, but the way they're going about it. I mean, the whole way they go about things. So if I may, Your Honor. The implications from kind of how they're going about things are they know what they're doing. So I have no understanding as to why a prosecutor being faced with a federal U.S. Supreme Court decision superseding their indictment twice would not include the language, call it the magic words, as Your Honor mentioned, but the men's rail relating to analog acts violations. But if they don't use the magic word but they give you information that supports a conclusion of knowledge, then that's good enough. It could be. That's what I'm saying. I mean, I like magic words. I think it's better to go ahead and use them, and I'm all for that. But that isn't dispositive. And the lower court said that even the lower court had a problem with the analog act part. The court was clear on the money laundering, but the lower court had a problem here. And it was difficult not to have a problem because you're faced with a Supreme Court decision and at least two Fifth Circuit cases that say you've got to use the McFadden language. And the reason we can see that the lower court had a problem is because the court said we are bolstering the analog act violations with the money laundering and the wire and mail fraud claims. There's a problem with that, which I'm sure the court understands. Money laundering is a derivative crime. So if you have – if you're – if there's a problem with the underlying crime, the only way you can launder money is – By doing something legitimate. You can't launder clean funds. Right. So you have to have criminal proceeds. If there's a problem with the underlying crime, then money laundering isn't going to expand that. As far as the mail and wire fraud, which is, as this Court said, a metallic – Let me ask you this. Yes, sir. If you allege facts that necessarily require intent and knowledge, isn't that enough? No. It's enough for certain things, Your Honor, but it's not enough for a pretrial restraint of assets. And this is what I'm getting to. It could be sufficient for a motion to dismiss the indictment. In fact, most definitely it would be sufficient for a motion to dismiss the indictment. And if we're in the civil side, it could also be sufficient for the plausibility test under Iqbal Twombly. But when you're dealing with forfeiture, it's a different animal. Isn't it reasonable probability? Isn't that what we're talking about? That's what we're talking about for the – we're talking about sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial. But I question the Court – Rule G standard? That's Rule G standard, yes, Your Honor. But I question the Court about one thing. This deals with the sufficiency of the forfeiture complaint. We're talking about the next step up. We're talking about restraint of untainted assets. We have here more than $10 million in untainted assets that have been proven. And the government couldn't take the time to put just Judge Haines' magic words into the second and third superseding indictment? That's a lot of assets. And that's, we all agree, is untainted. There are tainted assets, and we are not seeking the release of those at the moment. I think that they'll be acquitted at trial. But that's another story, and I'm not handling that. But we're talking about the pretrial restraints of untainted assets. In the money laundering as well, the Cuellar decision, the court below didn't even touch on the Cuellar decision. This court in Valdez and in the Demet decisions, both of them talked about the purpose of the transactions having to be to conceal or cover or mask one of the various elements, the nature or the location. There was none of that here, not only that. In the recitation of the facts by the court, the court didn't say otherwise. We're talking about a business that has a main bank account. Each one of the stores has a Wells Fargo account. They pay their expenses from that, and then the funds eventually go to the Gas Pipe, Inc. account. It's kind of like mobile gas stations. I mean, the fancy. I read in the briefs anyway that there were like eight or ten or twelve accounts. They call one account and put the money in another account. Exactly. There are twelve accounts because there are twelve stores, and each store has its own account. The money goes in, the money goes out, the expenses are paid, and then ultimately those funds go to the main account, the headquartered account, if you will. And from that, the business will purchase planes for the Lodge, which has been in business since 1990. Gas Pipe has been in business since 1970. Almost 50 years. They have not changed the way they've done business from day one. So according to the lower court and according to the government, on March 1, 2011, the date of the first alleged unlawful activity, the procedures that the business had in place on February 25 suddenly became improper. Nothing changed. The government talks about, you know, went from one account to another. Well, this court was one of the forerunners in that area in the Tenser decision in 1997, saying that pooling of funds, commingling, ink drop, what we used to call it, that won't do it as far as proving that the funds are subject to forfeiture. The government, not only can it be traced, although they haven't bothered doing so, no one alleges that it went from, you know, Kessler account to Smith account to Jones account to hide or mask the nature of the transactions. It went from Kessler. Were bank accounts, were commingle with tainted funds? I'm sorry, say that again, Your Honor. Were some of these bank accounts had clean money and dirty money also in them? So here's how I'll answer that question. On March 1, 2011, no one disputes there was more than $10 million in the accounts of gas pipe. The government claims that starting on March 1, 2011, they began committing illegal activity. The business used the same accounts, no masking of one account versus the other. They used, they put the money that they earned on March 1st in the same account that they used on February 28th of that year. So all the stores were selling the buys? The gas pipe stores were. Okay. And, you know, I can't answer that question, Your Honor. I'm not sure if all of them were. I know there were a handful of buys, and I don't know if they were done in each one of the stores. They were done in more than one of the stores. But the funds that were purchased for the Rapids Camp Lodge, which is a fishing and hunting lodge in Alaska, I understand it's beautiful, maybe someday I'll get there. Okay. It were perfectly fine. Purchasing the planes, the bush planes, was not covered, not masked in any way. Okay.  Thank you, Your Honor. Thank you. Counsel? Judge Haynes, and may it please the Court, Joe Magliolo for the United States. And while there are several technical legal issues potentially before the Court, this Court should dismiss this appeal for lack of jurisdiction because the order from which the claimants have appealed did not deny, grant, dissolve, modify, or otherwise have anything to do with an injunction of any sort, which is required for this Court to exercise interlocutory jurisdiction. Why don't our decisions in Melrose and Floyd? There are, Your Honor. Why don't we use that argument? They are distinguishable on an important ground. Probably. And towards that, just if I may back up just a moment and talk about 1292, because what it permits is this Court to consider appeals from interlocutory decisions where the district court modifies or otherwise has something to do with some sort of injunction. An injunction is an order directed to a party that's enforceable by contempt. In Floyd and in Melrose East, the government sought and obtained pretrial asset restraining orders against, in the Floyd case, that required Mr. Floyd to take his money and affirmatively deposit it into the bank. And in the Melrose East decision, it prohibited Mr. White, in that case, from conveying his interest in a piece of real property. The Floyd restraining order was found under 21 U.S.C. 853, which specifically says that if a party violates that restraining order, it's enforceable by civil and criminal contempt. There are no frozen assets and property here also? There are, Your Honor, but I think the important distinction is in those two cases, the parties were, there was an order against the parties and not an order against property like there is in this case. Why should that make any difference? Well, this court and the Supreme Court have long held that the interlocutory review of cases is disfavored and that the statutes permitting them must be narrowly construed. And this court, I believe, would be the first court to permit interlocutory review of an NREM-only seizure warrant under 1292A1. In Floyd and Melrose East, the court found interlocutory jurisdiction was appropriate because in those two cases, the district courts had issued orders that directed the party to either take an action or a refrain from taking an action, which put those cases squarely within 1292. Well, what if the parties in this case, what if the defendants did something contrary to the seizure? What if they did something contrary to it? What would happen to them? Well, I understand that, Your Honor. I think it would be some sort of separate action, some sort of separate crime or tort or something to that effect. But since the order at issue here was directed at property and not at the parties, it would be the same. Well, what does that really mean? I understand the Liz Pendon's concept. They can't sell these gas pipe entities. But what does it mean vis-à-vis the accounts? What does it mean vis-à-vis anything else besides simply selling or not selling the real property? So in this case, Your Honor, with respect to the personal property at least, the government sought and obtained civil seizure warrants, which allowed the government to essentially seize the property at issue. And so the government was allowed to exercise control over that property. And as a result, some of the property was physically seized. And with respect to the money in the UBS accounts, it was just frozen in place. So this case is more on all fours with two cases the government cited in its brief, United States v. Kitana Aguayo and United States v. Michelle's Lounge from the First Circuit and Seventh Circuit. And in those cases, the courts were facing, just like the court is facing now, the decision of whether or not it had interlocutory jurisdiction to consider challenges to in rem only seizure warrants. And in those two cases, the courts both found that it did not have interlocutory jurisdiction over the property restraints. The Seventh Circuit, I think, put it best, indicating that the injunction analogy is inapt in a situation like the one before the court today where there are in rem only property restraints. Did either one of those courts go ahead and allow a collateral order appeal? It did in Michelle's Lounge, but I think that's a separate consideration. I'm happy to discuss that. In Michelle's Lounge, it found no 1292A1 jurisdiction, but it did find jurisdiction under the collateral order doctrine. Now, in this case, the claimants did not assert the collateral order doctrine as a basis for jurisdiction until their reply brief. But they mentioned it only in passing, and they don't establish the three-element test that you need to in order to get collateral order doctrine-based jurisdiction. A party needs to demonstrate to get that sort of jurisdiction that the district court conclusively answered the disputed question, that the disputed question is separate from the merits of the case, and that it is effectively unreviewable on appeal from a final judgment. They didn't even attempt to meet one element of that three-element test, nor could they, because the district court did not conclusively answer the disputed question. It just continued the property restraints. The merits at issue are completely intertwined with the merits of the underlying decision, and it's not effectively unreviewable on appeal. Well, the part that's kind of unreviewable is all these years I have to go without my money if I'm the owner of Gaspipe. Had they made that showing, Your Honor, I might agree with you, but they have not made any showing to that effect here. They haven't. They have so much other money they can pay this fine lawyer to come and make the argument without the frozen assets. Is your position? Absolutely, Your Honor. And had they needed the money to pay for an attorney, they, I'm sure, would have made that argument. Had they needed the money to continue their businesses, I'm sure they would have made that argument. But having failed to make that argument. And the businesses are still functioning on these real property that are Liz Pendens-ed. Correct, Your Honor. I mean, all the notice of Liz Pendens does is provide the world notice that that property is involved in litigation but hasn't been seized. Right. So they can't sell it, but they can use it. It affects the merchantability of the property. No question about it, Your Honor. I mean, what about Beefy King? Didn't we hold that a Liz Pendens order was appealable? In that case, Your Honor, the court did hold that, but it was specific to a Florida statute. And that Florida statute, which permits notices of Liz Pendens to be filed, that Florida statute was in place at the time and is still in place now. And under that Florida statute, which I believe is unique to Florida law, an order challenging or a motion challenging a notice of Liz Pendens is immediately appealable in the same way an injunction is. In that case, I believe the court was operating. Why would a Florida statute give us jurisdiction? Well, I believe, Your Honor, it was the court was applying diversity jurisdiction in case. No, but diversity jurisdiction goes to the substance of the law. It doesn't go to get – I mean, Texas couldn't pass a law that says federal courts have jurisdiction over cases involving citizens of Texas for less than $75,000. I mean, they could pass that if they wanted, but it wouldn't give us jurisdiction. Certainly not. So I'm not understanding. I mean, I know about Beefy King, but I'm trying to understand your distinction. Why would the Florida statute saying it's immediately appealable somehow give us appellate jurisdiction? Well, I believe the court found it on that basis, and also in that decision the court cited to another case where the collateral order doctrine supported jurisdiction. So while I will concede it's not completely clear, I think the court found interlocutory jurisdiction on the basis of that Florida statute because otherwise there's nothing in that opinion that indicates that it should necessarily fall within 1292A1. And I would point out, Your Honor, that under the class of cases rule, if this court were to find jurisdiction over this situation where there is no unreviewability on final appeal, then the court will be required to consider on an interlocutory basis challenges to all civil seizure warrants circuit-wide, of which I understand there are thousands a year, even in the absence of irreparable circumstances or without regard to their qualification. So when somebody's arrested and their gun is seized, you're saying that would be immediately appealable if we ruled that there's jurisdiction here? Every time the government obtains property via a civil seizure warrant. I think that situation may be slightly different, but every time that someone, the government, seized a weapon via a civil seizure warrant, every time a bank account is used. Well, you're prophesying doom and I'm trying to understand the degree of doom. So what are these cases that will start flooding in during the Johnson flood? The government, with some frequency, obtains property before it obtains an indictment via civil seizure warrants.  Bank accounts frequently are seized. Vehicles are seized. Cars, occasionally real property. But in any event, the government obtains, I believe, circuit-wide some number of thousands of civil seizure warrants. And if this court finds jurisdiction to consider this one under the class of cases rule the Supreme Court has set forth, then every single civil seizure warrant going forward will be immediately challengeable on an interlocutory basis, even though, for example, a person who's been indicted by a grand jury cannot immediately appeal the grand jury finding that's put their liberty at stake. Earlier you distinguished the Fifth Circuit cases, Melrose and Floyd, on the basis that the orders in those cases, I'm probably getting this wrong, were directed to in personam. Correct. And these are in rem. That's exactly right. Explain to me the thinking behind the government seeking an in personam asset seizure, or whatever the term is, versus an in rem. I think there's a number of reasons. Why was the decision made here? Well, Your Honor, in a variety of cases, the government might seek an in personam order, like under 21 U.S.C. 853, where it has not previously seized property, but it secures, say, an information or an indictment. Based on that indictment, if the grand jury makes a probable cause finding, then based on that finding the government might obtain an in personam order. But I believe the standard for, for example, a criminal seizure warrant, you have to demonstrate that there's no lesser consequence or no lesser restraint that's available. And so there's a variety of practical reasons that the government. No, I appreciate it. I don't want to prevent us from getting to the merits. Understood. And so with respect to the merits of this case, I'd like to first discuss the standard that the district court applied to this situation, because the claimants have, I believe, wrongly assessed that the district court should have used the reasonable belief standard from supplemental rule G. In fact, this court and the Supreme Court have long held that probable cause is the correct standard to apply when considering whether or not a pretrial asset restraint is appropriate. The Supreme Court so held in the Monsanto case from 1989, and more recently in the Cayley decision in 2014. The circuit reached the same decision in the Melroses case we just discussed. Probable cause is a low bar. It's the sort of probability that reasonable and ordinary people would rely on. What's the difference in the two standards? Well, I think, Your Honor, the primary difference is when assessing it, when using the probable cause standard, the question is whether or not there is probable cause to believe that the government will ultimately demonstrate that the property is forfeitable. And the reasonable belief standard only assesses the sufficiency of a civil forfeiture complaint. And so that leads me to the next point of why the reasonable belief standard just is inapt here, because there's multiple operative documents which help demonstrate there's a probable cause. There is not only is there a civil forfeiture complaint, but there's also indictment. So it's sort of beyond me how in practical terms this standard, which only applies to the sufficiency of a civil forfeiture complaint, would apply in a case like this where there's parallel proceedings, there's an indictment that helps support the probable cause finding, and really this reasonable belief standard has only been applied by district courts. Well, what about this stuff that the ranch and the planes and all that are not part of the sale of spice and the alleged wrongdoing? Well, they don't have to be, Your Honor. The government's operating under several forfeiture theories. There's the one forfeiture theory that the government is entitled to seize and ultimately forfeit the proceeds of the crime. And the way of thinking about that is that's the robber's loot from a bank property or the money a drug dealer makes from selling drugs, just whatever property they directly obtain as a result of the offense. We're also operating under a much broader statutory forfeiture theory, which is all the property that's involved in a money laundering offense. So that allows us to seize and ultimately forfeit not just the money that's being laundered, the dirty money that's being laundered, but all the property that helps facilitate that laundering process. So that can consist of a number of things. That can consist of a business or clean money in a bank account that helps clean the dirty money. But we're also operating under a separate money laundering theory in parallel, and that is the money laundering theory set forth in 18 U.S.C. 1957. And that statute prohibits defendants from engaging in financial transactions with specified unlawful activity generated funds like here in amounts over $10,000. So if a person uses dirty money to purchase property, not only is it forfeitable under a proceeds theory like it is here, but it's also forfeitable as property involved in a money laundering offense in violation of 1957. So there's no reason we have to show that the property at issue is involved in the locus of the underlying criminal activities so long as we demonstrate that it was purchased with the specified unlawful activity funds. I don't want to prevent you from making your argument, but we heard a lot about McFadden from the appellant. So I guess let's start there. So is it accurate, as the appellant maintains, that the government steadfastly declined, refused, did not articulate the McFadden language in the various indictments that we heard about? No, Your Honor, it's not correct. What McFadden related to is what the government is required to prove to the jury in terms of mens rea. It didn't change or alter, as the district court found, what the government is required to charge in an indictment. The mens rea can be implied and attached to any of the acts involved in the indictment, and here the grand jury returned an indictment. The indictment tracks the statutory language from the controlled substance analog charge, and given that the grand jury has returned an indictment on that charge, under the Supreme Court's fairly recent Cayley case, the claimants in the court can't get behind the grand jury's probable cause determination. So because the grand jury returned an indictment on that count and because the count tracked the statutory language, the government's charge is certainly sufficient under the McFadden case. I concede, Your Honor, we will have to prove the case differently later this year than we would have to a few years ago, but that's the only effect McFadden has here. In McFadden, the government sought an instruction requiring only, quote, that the defendant knowingly and intentionally distribute a mixture or substance that was a controlled substance analog with the intent that it be consumed by humans. Yes. Am I right that the Supreme Court said that's insufficient? Correct, Your Honor. And I forget the precise element to which the government alleged in that case what the men's rate had to attach to, but the Supreme Court did find that it was incorrect. Okay. Did the indictment in this case use that same language? I don't know the answer to that, Your Honor. If it did, does that mean it's not sufficient? No, Your Honor. I think all the indictment has to do here is appropriately track the statutory language from the controlled substance analog statute, and then once we get the trial, we will have to prove the case to the jury and instruct the jury in a way that is concrete. But doesn't the indictment have to reflect the elements of the case? It does. Short of the basic premise of an indictment? Certainly, Your Honor, but it does. The McFadden decision did not alter the elements of a controlled substance analog charge. It revised what the government must show the men's rate attaches to when it ultimately takes the case. It doesn't influence the showing that you have to make. Surely. I know it's not a showing that you have to make at trial, but doesn't it, McFadden, influence the showing that the government has to make in order to justify the pretrial civil seizure or forfeiture? I don't believe it does. I mean, I think it's, again, worth remembering that the probable cause standard is a fairly low bar. It's not the sort of— But it's probable cause to commit a crime, that a crime has been committed. It's a two-step process, Your Honor. It's probable cause to believe that a crime that permits forfeiture has been committed, and then the second step is whether or not the property issue has the requisite connection to the crime. Okay, so McFadden doesn't speak to the second part, but it does speak to the first one. Correct, Your Honor, and under the Supreme Court's Cayley decision, since the grand jury has returned an indictment against the defendants in the claimant's safe for Mr. Herrig, because they returned that indictment, that first step is satisfied, and the claimants cannot get behind that decision. So all we have to demonstrate is the requisite— That's what Cayley holds. That's exactly right. That's right. That's what Cayley holds. But here you've told me that the indictment may contain the language that wasn't okay in McFadden. I think the language that was at issue was not the charging language, but the jury instruction language. I don't believe that the court in McFadden— That's right. It was an instruction. It had nothing to say about the charging document. I think it was just the jury instruction. So I would like to turn now to briefly discuss the mail-and-wire fraud issue here, because even if the court has a problem with the McFadden issue, and I don't think it should, but even if it does, the mail-and-wire fraud charges, which, again, the grand jury have returned true bills on, those independently support the proceeds theory in this case, and those proceeds were laundered through the same web of accounts that the illegal controlled substances were directed through. So, again, under Cayley, the grand jury has returned an indictment against the defendants for mail-and-wire fraud, and in the amended complaint for forfeiture, we have shown how the property at issue is connected from the charges to the property.  It went from these operating accounts to UBS accounts, where it was commingled with some clean money and dirty money, and some of the UBS accounts were used as collateral for other UBS accounts, and then from there it went on to purchase the real and personal property. So even if the court has an issue with the McFadden language, and, again, we don't think it should, the mail-and-wire fraud presents an alternative basis for the court to think about the specified unlawful activity funds that were involved in the money laundering conspiracy. Forgive the potentially dumb question, but those other crimes, the money laundering, mail fraud, those are not derivative of the Analog Act? Are they separate? The mail fraud and wire fraud conspiracy is not derivative of the controlled substance analog case. They are separate and parallel. The core of that crime, mail fraud and wire fraud, is that the defendants communicated with people buying the product and told them it was something that it wasn't? Two key things there, Your Honor. The locus of the mail-and-wire fraud scheme is the scheme to the fraud, and it was mislabeling these packages which they said were not intended for human consumption but which were, in fact, intended for human consumption. The communications which occurred were about essential elements of the scheme, as the third superseding indictment states, and the interstate mails were used to receive significant quantities of the spice. In my remaining time, I would simply ask this Court not to dramatically expand the scope of interlocutory jurisdiction and dismiss this case because the claimants have not established that the district court's order modified, granted, denied, or had anything to do with an injunction. And if it doesn't make that finding, I would just ask that this Court affirm the district court's decision on all fronts. Okay. Thank you, Your Honor. Luckily you talk fast, Mr. Kessler. You have two minutes. That's what my kids say, Your Honor. Just a couple of things, if I may. Talk about the jurisdiction because you really didn't the first time. Jurisdiction. I'm happy to talk about jurisdiction. As my oldest would say, you've got to be kidding. Twenty-five years ago, this Court in Floyd said that pretrial restraint is an appealable order as an injunction under 28 U.S.C. 1292A1. That was in the criminal side. 2004, in the civil restraint restriction, and we have both here. The reason we have both is not my fault, Your Honor. The reason we have both is because the government chose to use both. We have Melrose East 357F3rd, 2004, where the Court said even civil restraints are subject to the immediate appellate review. Can you make a distinction between an impersonum and an in rem? I don't quite understand that distinction. I understand the distinction, but I don't understand the distinction. So an in rem seizure would have to be if the Court would seize me, right? It's an impersonum. I'm sorry. An impersonum seizure would be seizing the person. An in rem seizure is seizing property or restraining property. All restraints deal with restraining property unless there's something that I do not know about. As far as 853 is concerned, which the government mentioned, which is the criminal forfeiture statute, 853E actually uses a substantial probability standard as far as restraint is concerned, which is higher than the probable cause and higher, I would argue, than the Rule G standard as well. So I'm happy with the substantial probability standard because the government is not going to be able to meet that either. The assets here were frozen under both civil and criminal, a double captioned case. If I may, just two quick points. You heard a concession on the McFadden point, but that is easy enough for the Court to do. Just take a look at the indictment. And finally, the complexity of the transactions, please just take a look at the record. There was nothing complex at all about going from account A to account B. We have your arguments. We appreciate both sides. And we will take a